# Parrish *v.* The Equitable Life Assurance Society, Appellant.

Argued January 11, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Thomas Lewis Jones,* for appellant.

*David L. Baird,* with him *Thompson & Baird,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 1, 1954:

On May 20, 1951, Sylvan G. Parrish, 49 years of age, was found lying on the floor of the bathroom in his home, dead. A swelling on the left side of his head indicated that he had suffered a blow of some kind prior to death. His widow, Gladys W. Parrish, the plaintiff in this case, applied to the Equitable Life Assurance Society of the United States, for double indemnity benefits on two insurance policies of $5,000

each taken out by the deceased in 1928. The insurance company refusing to pay the sums claimed, Mrs. Parrish entered suit in assumpsit and recovered a verdict in the sum of $10,000. The defendant company moved for a new trial and for judgment n.o.v. The refusal of those motions brought the case here on appeal.

The double indemnity provision in the policies reads in part: "Death from accident means death resulting solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent and purely accidental means and ensuing within 90 days of such injuries, but does not include death resulting from or caused directly or indirectly by self-destruction sane or insane, disease or illness of any kind, physical or mental infirmity . . ."

This language imposed upon the plaintiff the burden of establishing two things: (1) that the insured's death was the direct result of an accident, and (2) that the evidence of death excluded that any pre-existing illness, malady or infirmity contributed thereto.

These two burdens were successfully carried by the plaintiff to a just and sustainable judgment.

On April 24, 1929, the deceased became ill with a condition described as occlusion of the posterior inferior cerebellar artery on the left side (also referred to as a blood lesion on the medulla oblongata), which brought on symptoms of headaches, nausea, dizziness and inability to walk. After several months of treatment, he made a complete recovery with the exception of an anesthesia which persisted to the left side of his face and to the whole right side of his body.

On May 19, 1951, the day prior to his death, the insured pursued the normal activities of a well man: he dined at the home of a friend, he went to the hospital to see his wife who was recovering from an operation; he visited with other friends until 2 o'clock of Sunday morning at which time he returned to his home.

The evidence reveals that for the entire day preceding the fatal day, Sylvan Parrish walked, talked, ate and drank like a normal human being enjoying good health; and he was described also as being in very good spirits, particularly so because of the reassuring news he had received that his wife was making a good recovery from her operation.

What happened from 2 a.m. Sunday, when he entered his otherwise unoccupied home, until he was found dead at 8 o'clock that evening, is locked in the mystery of the unseen, unwitnessed and unrecorded. Only the key of circumstantial evidence could unlock the enigma.

Lee James, who discovered the body, testified: "Q. Now, Mr. James, when you went into the bathroom and found Mr. Parrish on the floor, how was he lying? A. I would say he was lying in a sitting position. Q. And was he on his back, or his side, or just what part of his body was he lying on? A. He was lying on his left side. Q. And did you notice anything with reference to the location of his feet? A. His right leg was sort of curled around the side of the commode. Q. And when you say curled around the side of the commode, do you mean on the one side, the far side of the commode? A. On the far side, next to the wall. Q. And where, Mr. James, with reference to the photograph was his head located? A. His head I would say was about right in there (by indication), underneath the lavatory. Q. That is immediately under the edge of the lavatory, is that correct? A. Yes."

Dr. Dorothy F. McClure, who attended an autopsy on the body of the deceased, testified: "Q. Dr., in observing that autopsy what were your findings and conclusions? A. I concluded that the death would have been due to concussion and shock following a blow to the head, or an injury to the head. Q. What gave rise to your conclusion? A. The appearance of the hema-

toma of the scalp and no other evidence to account for the death. Q. And, Dr., what then is your opinion of the cause of death of Mr. Sylvan G. Parrish? A. In my opinion he died of a concussion following the injury to the head. Q. Now, this hematoma of which you speak, will you explain to the jury where that was? A. In the frontal area and directly over the temporal area. Q. On which side? A. On the left side. Q. By hematoma what do you mean? A. A swelling caused by a hemorrhage into the soft tissues. Q. What causes such hematoma? A. A blow. Q. Would such a condition as a hematoma take place or show up on the body of a deceased person if that blow was not struck until after death? Mr. Jones: Objected to as leading. Mr. Baird: We will withdraw the question. Q. Dr., in your opinion would such a condition as you found on the body of the deceased occur if such a blow was not delivered until after death? A. No. Q. Then it would have to be struck before death. Is that correct? A. I think so, yes. I think that is so in order to have the condition. Q. What did you say this hematoma was from? A. The hematoma which is the bleeding into the soft tissues, it would have to occur before death, during the life of the patient."

Dr. A. J. Bruecken, who performed the autopsy for the defendant company, testified that although the deceased had a bump on the side of his head "about the size of an egg," the blow which caused that protuberance was in no way responsible for his death. In his opinion the insured died from the effects of a brain lesion he had suffered 22 years before.

The diametrically opposing opinions of the doctors went to the jury, together with other evidence presented by the plaintiff as to the insured's normal habits and good health. The judge's charge was a model of fairness and clarity; it presented the issue of fact squarely to the jury, it contained a correct statement of the law

as to the burden of proof which had to be carried successfully by the plaintiff in order to win a verdict. We have studied the record and find that it amply supports and substantiates the verdict returned in favor of the plaintiff.

In the case of *Pomorskie v. Prudential Insurance Company of America,* 318 Pa. 185, the insured's body was found with a mark the size of a quarter on his left forehead. In affirming the verdict of the jury for the plaintiff we said: "The jury might well have inferred from the position of and marks on the insured's body, the surrounding circumstances, and the fact that he was apparently lame, that he fell by accident, because of some obstruction or slippery condition on the ground, and that in so doing he suffered a blow to his head which caused concussion of the brain and eventually led to his death. There was testimony that he might have had concussion even though no evidence of concussion was found in the brain tissues. The evidence may be sufficient to sustain a finding that death occurred through external, violent and accidental means although there are no eyewitnesses (McCullough v. Railway Mail Assn., 225 Pa. 118), or although it does not 'establish a specific one of a number of accidental causes', if it does in fact fairly exclude design or disease."

Dr. Andrew L. Benson, the insured's personal physician, testified that from a date some two months following the illness in 1929 until the date of his death, Sylvan Parrish had experienced (excluding the anesthesia) good health.

We are satisfied from the entire record that there was more than sufficient evidence upon which the jury could find that the insured's death occurred through "external, violent, and accidental means," and that the death was not contributed to by any pre-existing illness, malady or infirmity.

In the case of *R. E. Tr. Co. of Phila. v. Met. Life Ins. Co.*, 340 Pa. 533, we held: "This Court is of opinion that plaintiff's evidence was sufficient to require the submission of the case to the jury upon proper instructions. There was testimony that the insured suffered an injury to the head in the collision, and that his death was caused solely by the concussion. Plaintiff's medical witnesses excluded disease as a contributing cause. The credibility and weight of this evidence was for the jury to determine . . ."

The reasoning and conclusions in that case could well apply to the instant case.

Judgment affirmed.

Mr. Justice BELL dissents.