Kubacki *v.* Metropolitan Life Insurance
Company, Appellant.

Argued April 11, 1960. Before RHODES, P. J., GUN-
THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONT-
GOMERY, JJ.

*Charles G. Sweet*, for appellant.

*Adolph L. Zeman*, with him *Robert L. Zeman*, and *Zeman & Zeman*, for appellee.

OPINION BY WRIGHT, J., September 16, 1960:

We are here concerned with an action in assumpsit instituted by Rose M. Kubacki to recover double indemnity under a policy issued by the Metropolitan Life Insurance Company insuring the life of her husband, Andrew A. Kubacki, who died on October 22, 1957. The jury returned a verdict in favor of the plaintiff beneficiary. Motions by the defendant for judgment n.o.v. and for a new trial were overruled by the court en banc, one judge dissenting. The defendant has appealed from the entry of judgment on the verdict. The relevant policy provision is set forth in the footnote.[1]

---

[1] "Accidental Means Death Benefit—The Company promises to pay to the Beneficiary under this Policy, in addition to the amount otherwise payable according to the terms of this Policy, an additional sum equal to the Amount of Insurance shown on page 1, upon receipt at the Home Office of due proof of the death of the Insured, while this provision is in effect, as the result, directly and independently of all other causes, of bodily injuries caused solely by external, violent, and accidental means, and that such death shall not have occurred (a) more than 90 days after the date of such injuries, or (b) as the result of or by the contribution of disease or bodily or mental infirmity or medical or surgical treatment therefor or infection of any nature unless such infection is incurred through an external visible wound sustained through the violent and accidental means, or (c) as the result of self-destruction, whether sane or insane, or (d) as the result of travel or flight on any species of aircraft if the Insured has any duties relating to such aircraft or flight, or is flying in the course of any aviation training

On the date of his death, Kubacki drove from his home in the Borough of Canonsburg to the nearby Citizens Water Dam for the purpose of fishing. Because of the abnormally dry weather, the water in the dam had receded for a considerable distance. The intervening area consisted of mud which had crusted over. At about 4:00 P.M., Harry T. Gibbs, a witness for the plaintiff, came across Kubacki's automobile sitting along the road with its motor running and the driver's door open. Gibbs then noticed Kubacki lying on his back about 100 feet out in the mud area. His left leg was stuck in the mud up to the knee. His right leg had been pulled completely out of the hip boot with the boot stuck in the mud and the sock still in the boot. Extreme difficulty was experienced in removing the body from the mud. Kubacki was pronounced dead by Dr. Sidney Safran at the Canonsburg Hospital. An autopsy, limited to the thoracic cavity, was performed by Dr. Ernest L. Abernathy, one of the pathologists at the Washington Hospital.

Plaintiff's theory at the trial was that Kubacki's death resulted from his efforts to extricate himself from the mud and that he died from a cerebral hemorrhage, independent of any other contributing cause. The theory of the defense, based on the autopsy report, was that Kubacki died as the result of an existing heart condition, which not only contributed to his death but actually was the sole and exclusive cause. The autopsy report is set forth in the footnote.[2]

---

or instruction, or any training or maneuvers of any armed forces, or, (e) as a result of participating in or attempting to commit an assault, or (f) as a result of an act of war . . ."

[2] "*General*—The body is that of a well-developed, well-nourished white male appearing approximately 35 years of age. The body has been embalmed. External examination reveals nothing of note aside from a bright yellow deposit on the left lower eyelid near the inner canthus which is typical of xanthelasma.

Plaintiff testified that her husband was 38 years of age, that he maintained steady and regular employ-

"*Incision*—This is limited to the thoracic cavity. The fatty panniculus is bright yellow and is about a centimeter in thickness. The muscles are dark red and well-developed. As the muscles are cut across a good deal of dark red blood mixed with embalming fluid exudes. In situ organs are in normal position and relations except that the heart is enlarged to slightly more than half the total transverse diameter of the chest. The pleural cavities both show numerous old fibrous adhesions but the lungs appear normal in situ and no further examination of them is made. The pericardial sac contains about 20 cc. of bloody fluid.

"*Heart*—Further examination is limited to determining the cause of death. The heart is further examined in situ revealing that the blood appears to come from a small bleeding point on the posterior surface of the heart just at the base of the interventricular septum. Here the epicardium shows a tiny hemorrhagic dot with marked mottled hemorrhagic discoloration apparent in the deeper layers. The heart is now removed in the usual fashion. The epicardial surface is carefully examined and shows in addition to the small pinpoint hemorrhagic area noted above an area of whitish scarring overlying the apex of the left ventricle. Incision into the right sided chambers reveals that they are of normal size and configuration. The valves have smooth translucent leaflets. On the left the atrium is slightly enlarged. The endocardium is smooth and glistening. No clots are found. The mitral valve has thin smooth translucent leaflets. The left ventricle is markedly enlarged and cup-shaped. Overlying the apex of the ventricle and extending on to the interventricular septum is a roughly circular patch of dull white scar tissue. The muscle here is entirely replaced by scar and the entire thickness of the wall is about 4 mm. in contrast to the 18 mm. thickness elsewhere. The aortic valve has smooth translucent leaflets. The root of the aorta shows numerous bright yellow atheromatous plaques. The orifices of the coronary arteries are normal. Section into the coronary arteries now reveals the left anterior descending branch to be completely occluded from a point about 1 centimeter from its origin down as far as it can be traced. It is filled with firm brownish to reddish-brown thrombus throughout. Numerous yellow atheromatus plaques are seen in all branches of the coronary artery, which produce marked narrowing, particularly in the left distribution but also in the right. A few

ment, that he never lost any work because of sickness or ill health, that he was an expert glazier and often performed services of that nature after his working hours, that he assisted the carpenters, plumbers, and painters in working on his dwelling, recently remodeled, that he did all of the usual chores around the home and around the home of his parents who lived nearby, including mowing the lawn and spading a large garden, that her husband had returned from work about 3:00 on the day of his death and was apparently in normal health. Her testimony was substantially corroborated by that of Joseph Arceri and E. I. Vitullo.

Dr. Harold Sloan, who impressed the trial judge "as having a profound grasp of the medical problems

---

calcified points are encountered. Section into the muscle now reveals first the old apical scar already noted, and a more recent scar in the lateral border of the left ventricle with partly degenerated muscle. The lateral muscular scar interdigitates in a very irregular fashion but is roughly circular and is about 2 cm. in diameter. Section into the septum now reveals recent hemorrhagic necrosis estimated about 4 days age which involves the mid-portion of the septum. Again this is a roughly circular patch about 3 cm. in diameter. There is marked subendocardial hemorrhage. An extension of this patch of hemorrhagic necrosis reaches to the surface of the heart near the base of the septum and presumably accounts for the pericardial hemorrhage previously noted. No further examination is made.

"*Diagnosis*—1. Myocardial infarction, multiple, old and recent. (See gross description)

2. Coronary occlusion, old and recent, left anterior descending.
3. Arteriosclerosis, generalized, marked and coronary, marked.
4. Hemopericardium, minimal.
5. Multiple fibrous pleural adhesions.
6. Xanthelasma.

"*Comment*—The cause of death in this case was myocardial infarction secondary to both old and recent occlusion of the coronary artery. Presumably the terminal event was the extension of the previously existing thrombus to involve a fresh area of muscle".

involved", testified for the plaintiff that the cause of Kubacki's death was a cerebral hemorrhage and that the heart condition disclosed by the autopsy was not in any way a contributing factor. "A. Well, in my professional opinion, the cause of death here was definitely due to a cerebral hemorrhage . . . Q. Doctor, in your opinion, even if we assume the conditions of this man's heart as disclosed by Dr. Abernathy's report, in your professional opinion, would the condition of this man's heart in any way contribute to his death? A. None whatsoever. Q. Doctor, if this man had had a perfectly normal heart, would the end result have been the same? A. Exactly the same". Dr. Sloan stated that "in medical diagnosis you would say it was a subarachnoid hemorrhage" caused by fear and panic in Kubacki's attempt to extricate himself from the mud—"in a layman's term, you might say he was scared to death". Without questioning the autopsy findings, Dr. Sloan pointed out that Dr. Abernathy did not follow the usual and established procedure of posting the entire body, including the brain. He stated that persons with myocardial infarction often lead normal lives and die from independent causes. Vigorous cross-examination failed to shake Dr. Sloan's testimony.

For the defense, Dr. Abernathy testified in detail as to the autopsy, and that "the sole single cause" of Kubacki's death was a coronary occlusion with consequent infarction. His conclusion was largely predicated on the basis of an assumption that a thrombus had formed four days prior to death. Dr. Abernathy admitted that there are types of brain hemorrhage which cause sudden death, and that without an examination of the brain he could not say whether or not there was a cerebral accident. He attempted to explain the incomplete autopsy on the ground of a policy of economy in the coroner's office. Dr. J. Paul Proudfit, formerly

a medical examiner for the appellant, testified that the conditions described in the autopsy report "are quite adequate as a complete explanation for death", and stated that Kubacki died "of a clear cut coronary occlusion". He admitted the possibility of a cerebral accident independent of a heart condition, and that coronary occlusion is frequently found at autopsy in persons who have died of other causes.

Appellant's first and principal contention is that the lower court should have granted judgment n.o.v. because the plaintiff failed to establish that Kubacki died "as the result, directly and independently of all other causes, of bodily injuries caused solely by external, violent, and accidental means". In passing upon this contention we must view the evidence in the light most favorable to the plaintiff who has the verdict: *Geiger v. Schneyer,* 398 Pa. 69, 157 A. 2d 56; *Richardson v. Wilkes-Barre Transit Co.,* 172 Pa. Superior Ct. 636, 95 A. 2d 365; *Forbes v. Forbes,* 159 Pa. Superior Ct. 243, 48 A. 2d 153; *Lessy v. Great A. & P. Tea Co.,* 121 Pa. Superior Ct. 440, 183 A. 657. Appellant argues that the verdict cannot stand in the face of the positive autopsy findings, that the plaintiff's evidence is wholly speculative, having no foundation in scientific fact, and that as a matter of law the type of opinion evidence presented by Dr. Sloan was insufficient to support the verdict.

There is no dispute as to the applicable legal principles. Plaintiff concededly had a two-fold burden. She was required not only to show a direct causal relation between the accident and the death, but also to establish that the death was caused solely by external and accidental means. Where the proof points to a pre-existing and substantial infirmity which may have been a contributing factor, plaintiff must also produce evidence to exclude such possibility: *Rodia v.*

*Metropolitan Life Insurance Co.*, 354 Pa. 313, 47 A. 2d 152. And see *Real Estate Trust Co. of Philadelphia v. Metropolitan Life Insurance Co.*, 340 Pa. 533, 17 A. 2d 416; *Lucas v. Metropolitan Life Insurance Co.*, 339 Pa. 277, 14 A. 2d 85; *Roeper v. Monarch Life Insurance Co.*, 138 Pa. Superior Ct. 283, 11 A. 2d 184. Our review of the record in the instant case clearly indicates that the testimony adduced by the plaintiff was sufficient to sustain her burden. In the words of Judge WEINER: "Medicine is not an exact science, in its totality, but a mixture of science and art. There may be and frequently are areas in which physicians of unquestioned integrity and competency may reach differing conclusions on the same facts". The testimony of Dr. Sloan expressed his professional opinion that Kubacki died as the result of a cerebral hemorrhage independent of any other contributing cause. The value and weight of his testimony was for the jury. Certainly the members of this court cannot set themselves up as super experts in the field of medicine and announce as a matter of law that the evidence was insufficient to support the verdict.

The instant case is comparable in many respects to *Parrish v. The Equitable Life Assurance Society*, 376 Pa. 611, 103 A. 2d 678, wherein a verdict for the plaintiff was affirmed on appeal. The following statement by Mr. Justice MUSMANNO in the *Parrish* case is particularly applicable: "The diametrically opposing opinions of the doctors went to the jury, together with other evidence presented by the plaintiff as to the insured's normal habits and good health. The judge's charge was a model of fairness and clarity; it presented the issue of fact squarely to the jury, it contained a correct statement of the law as to the burden of proof which had to be carried successfully by the plaintiff in order to win a verdict. We have studied the record

and find that it amply supports and substantiates the verdict returned in favor of the plaintiff". Other cases in which verdicts have been sustained under similar policy language are: *Frame v. Prudential Insurance Company of America*, 358 Pa. 103, 56 A. 2d 76; *Foulkrod v. Standard Accident Insurance Co.*, 343 Pa. 505, 23 A. 2d 430; *Real Estate Trust Company of Philadelphia v. Metropolitan Life Insurance Co.*, supra, 340 Pa. 533, 17 A. 2d 416; *Arnstein v. Metropolitan Life Insurance Co.*, 329 Pa. 158, 196 A. 491; *Dauphin Deposit Trust Co. v. Lumbermens Mutual Casualty Co.*, 171 Pa. Superior Ct. 86, 90 A. 2d 349.

Appellant contends alternately that it is entitled to a new trial because the verdict was against the weight of the evidence. In passing upon this contention we must consider all of the evidence, and assess its weight to determine whether the lower court abused its discretion: *Jemison v. Pfeifer*, 397 Pa. 81, 152 A. 2d 697. We find no abuse of discretion in the instant case. When a new trial is sought upon the ground that the verdict was against the weight of the evidence, only a most unusual situation will warrant the appellate court in granting a new trial which has been refused by the court below: *Battistone v. Benedetti*, 385 Pa. 163, 122 A. 2d 536. Where the testimony supports the jury's finding, the trial court's refusal to disturb the verdict is proper even though such finding may not have been the only possible inference: *Maloney v. Rodgers*, 184 Pa. Superior Ct. 342, 135 A. 2d 88. Appellant cites cases on the point that opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts. See *Draper's Estate*, 215 Pa. 314, 64 A. 520; *Commonwealth v. Heller*, 369 Pa. 457, 87 A. 2d 287; *Avins v. Commonwealth*, 379 Pa. 202, 108 A. 2d 788. We subscribe to this general proposition. In the case at bar, however, the evidence

offered by both sides on the crucial issue was entirely opinion. Appellant would have us accept its theory that the opinions offered by its experts were supported by facts developed in the autopsy. But there was only a partial autopsy, and we are no more willing than apparently was the jury to accept the report thereof as an unqualified factual basis for the opinions of appellant's doctors. Plaintiff presented uncontroverted evidence as to decedent's prior good health which casts doubt on the significance of the facts revealed by the autopsy. It should be noted that both Dr. Proudfit and Dr. Abernathy completely disregarded decedent's prior health in arriving at their conclusions.

Appellant also contends that "there are material errors in the admission of evidence" which require the grant of a new trial. The first of these complaints is that the trial judge improperly excluded an averment by the plaintiff in paragraph 6 of a complaint which she had filed against the Citizens Water Company which was allegedly contradictory to the testimony based on the averment in paragraph 4 of the complaint in the instant case. The contrasting averments are set forth in the footnote.[3] In this connection we agree with the court below that there was no apparent contradiction, and that a collateral issue would have been improperly injected into the trial.

The second complaint relates to the exclusion of the death certificate. This certificate had been prepared and executed by the deputy coroner on the basis of in-

---

[3] (4) "On October 22, 1957, Andrew A. Kubacki died solely and exclusively by accidental means as the result of sinking into a quagmire or sink hole . . . and in his efforts to extricate himself therefrom".

(6) ". . . As a result of his efforts to extricate himself and the strain incident thereto, the said Andrew A. Kubacki died at the site".

formation received from Dr. Abernathy, and without any personal knowledge of the cause of death. The deputy coroner would have been incompetent to testify if called as a witness: *Heffron v. Prudential Insurance Company of America,* 137 Pa. Superior Ct. 69, 8 A. 2d 491. Section 810 of the Act of June 29, 1953, P. L. 304, 35 PS §450.810, provides that: "Any record or duly certified copy of a record or part thereof which is (1) filed with the department in accordance with the provisions of this act and the regulations of the Advisory Health Board . . . shall constitute prima facie evidence of its contents". While it has been held that the cause of death may be shown by the death certificate, *Castor v. Ruffing,* 178 Pa. Superior Ct. 124, 112 A. 2d 412, it is always open to explanation and contradiction: *Griffin v. National Mining Co.,* 127 Pa. Superior Ct. 588, 193 A. 447; *Hanrahan v. John Hancock Mutual Life Insurance Co.,* 143 Pa. Superior Ct. 557, 18 A. 2d 512. We perceive no substantial error or injustice which resulted from the exclusion of the death certificate under the circumstances of the instant case. Appellant undertook to prove the cause of death by medical testimony, and by the autopsy report which was admitted as Defendant's Exhibit 2. As pointed out by the court below, the death certificate was merely a repetitious summary of this lengthy evidence. See *Lederer v. Metropolitan Life Insurance Co.,* 135 Pa. Superior Ct. 61, 4 A. 2d 608.

The third complaint involves the refusal of the trial judge to permit the autopsy report to go out with the jury. This is a matter which is largely within the discretion of the trial judge: *Commonwealth v. Clark,* 123 Pa. Superior Ct. 277, 187 A. 237; *Quartz v. Pittsburgh,* 340 Pa. 277, 16 A. 2d 400. Dr. Abernathy had testified in detail concerning the autopsy report, and it had been read in evidence. The trial judge took the position that

sending out the technically worded report would not be of material aid in the deliberations of the jury. We perceive no abuse of discretion in this ruling. See *Zank v. West Penn Power Co.*, 169 Pa. Superior Ct. 164, 82 A. 2d 554.

Judgment affirmed.

